1

2

3

4

5

6

7                    IN THE UNITED STATES DISTRICT COURT

8                 FOR THE EASTERN DISTRICT OF CALIFORNIA

9   VONZELL R. GLASS,                )
                                     )  No. CV-06-2555 RHW JPH
10            Petitioner,            )
                                     )  REPORT AND RECOMMENDATION TO
11  v.                               )  DENY WRIT OF HABEAS CORPUS
                                     )
12  D. K. SISTO, Warden, et al.,     )
                                     )
13            Respondents.           )
                                     )
14  _____  )

15

16      **BEFORE THE COURT** is a Petition under 28 U.S.C. § 2254 for

17  Writ of Habeas Corpus by a person in state custody (Ct. Rec. 1)

18  and Respondent's Answer and Memorandum of Authorities (Ct. Rec.

19  16).  Petitioner appears pro se and Respondent is represented by

20  Deputy Attorney General Peter W. Thompson.  This matter was heard

21  without oral argument.  After careful review and consideration of

22  the pleadings submitted, it is recommended that the Petition for

23  Writ of Habeas Corpus be **denied.**

24      At the time his petition was filed, Petitioner was in custody

25  in Vacaville, California, pursuant to his 2005 Sacramento County

26  conviction for assault with a firearm, possession of a firearm by

27  a convicted felon, carrying a concealed weapon, and discharging a

28

REPORT AND RECOMMENDATION TO DENY
WRIT OF HABEAS CORPUS
- 1 -

firearm in a grossly negligent manner.  (Lodged Document 2 at 319-320.)  Petitioner challenges these 2005 Sacramento County convictions.  (Ct. Rec. 1, Lodged Document 1 at 271-272, 274-277.)

**I. BACKGROUND**

**A. Factual History**

The Third District Court of Appeal described the facts of this case as follows:

> On September 30, 2004, Tracy Washington, a dispatcher for the Sacramento County Sheriff's Department, received a call from a person identifying herself as Niko. Niko told Washington she had seen "a black male shooting at another male."  She described the shooter as "[a] black adult male, mid 30s and five nine, heavy, wearing a black leather jacket," dark jeans, and leaving in a black Mustang.  Niko also said "that this individual lived in the same apartment complex in apartment number eight."  She knew the suspect was from apartment No. 8 because they previously had problems in the complex with the same person.  Niko told Washington that she was in apartment No. 11.  Washington received the description of the shooter at 1:13 a.m.

> Deputy Sheriff Dean McCowan was working as a patrol officer on September 30, 2004.  At approximately 1:10 or 1:11 a.m., he was dispatched to a shooting that took place near Fulton Avenue and Hurley Way.  He received the following description of the suspect responsible for the shooting: "Black, male adult, approximately five seven to five eight in height, heavy build, in his 30s, wearing black leather jacket and dark jeans."  Between approximately 1:22 and 1:25 a.m., Deputy McCowan and three other deputies arrived at the apartment complex and checked the parking lot for the suspect vehicle -- a black Mustang -- described by the 911 caller.  The deputies did not proceed to the 911 caller's apartment because of its proximity to apartment No. 8, the apartment linked to the suspect.

> The deputies encountered only two people while exploring the parking lot -- a male and a female who were walking from the back of the complex east toward Fulton Avenue.  Deputy McCowan testified the male was a black adult "wearing a long black leather coat, dark shirt, and dark jeans" five feet seven inches to five feet nine inches tall with a heavy build.  He later identified the defendant as the male suspect.

REPORT AND RECOMMENDATION TO DENY
WRIT OF HABEAS CORPUS

1
2
3
4
5

        When he saw defendant matched the description of
the shooter, Deputy McCowan asked if he could talk to
him, to which defendant said,"sure."  As defendant
approached, Deputy McCowan asked him to remove his hands
from his pockets and defendant complied.  Deputy McCowan
then asked if he had any weapons and if defendant minded
if he checked.  Defendant replied, "no, go ahead," so Deputy
McCowan conducted a patsearch.  Deputy McCowan
believed this occurred around 1:25 a.m.

6
7
8
9
10
11
12
13
14
15
16

        Although Deputy McCowan did not find any weapons
during the patsearch, he "felt a number of objects in
his pockets," but did not remove any of those items at
that point.  Deputy McCowan then asked defendant if he
had any identification, and whether he had any knowledge
of the earlier altercation at the apartment complex.
Defendant presented a DMV paper printout with a
photostatic picture.  Deputy McCowan continued to
converse with defendant for approximately five minutes,
during which time defendant said he was heading to his
girlfriend's apartment, which defendant identified as
apartment No. 8.  Because this was the same apartment
number linked to the suspected shooter, Deputy McCowan
testified he "had reason to believe [defendant] was
probably the suspect we were looking for in the
shooting."  Deputy McCowan then "detained" defendant
and conducted a records check.  At approximately 1:45
a.m., Deputy McCowan learned defendant was on parole and
had an extensive criminal history for weapons and robbery
charges.

17
18
19
20
21
22

        Deputy McCowan relayed the status of the situation
to his sergeant at approximately 1:50 a.m.; the sergeant
responded that he was talking with the persons who
witnessed the shooting and was considering conducting a
field show up.  At about 2:10 or 2:15 a.m., however,
Deputy McCowan's sergeant advised him "that the initial
witnesses were fearful for their safety, did not want
to become involved and did not want to participate in the
field show-up" with defendant.  During the time Deputy
McCowan was with defendant and awaiting information on
the field show up, other deputies were investigating the
crime scene and speaking to defendant's girlfriend.

23
24
25
26
27
28

        A crime scene investigator collected gunshot residue
samples from defendant around 2:20 a.m., a process which
took about 10 minutes.  At approximately 2:44 a.m.,
Deputy McCowan contacted defendant's parole agent, Eric
Sakazaki, who placed a parole hold on defendant based on
the information he received from Deputy McCowan.
However, Agent Sakazaki did not authorize a further
search of defendant's person or property.

REPORT AND RECOMMENDATION TO DENY
WRIT OF HABEAS CORPUS
- 3 -

1

2

3

4

5

    Based on the parole hold, Deputy McCowan conducted
an inventory search of defendant between 2:45 and 2:50
a.m., at which time he removed a set of keys from
defendant's pocket.  The keys were attached to a keyless
remote entry system, which the deputies could use to
attempt to locate defendant's car.  Upon discovering a
means to locate the car, Deputy McCowan gave the keys
and remote to Deputy Jeff Long who went through the
parking lot clicking the remote to see which car responded.

6

7

8

9

10

11

    During this time, Deputy Stacy Jaquith spoke with
defendant's girlfriend, Victoria Thomas, the female
found walking with defendant in the parking lot.
Thomas gave Deputy Jaquith a statement about what
happened that night.  Shortly after 2:50 a.m., Deputy
Jaquith informed Deputy McCowan that Thomas implicated
defendant in the shooting; however, this was after
Deputy McCowan had searched defendant's pockets.
Additionally, Thomas gave deputies information about
the location of the black Mustang.

12

13

14

    Based on the information provided by Thomas,
deputies found the black Mustang immediately south of
the apartment complex.  The Mustang was registered to
defendant.  Deputy McCowan later learned that deputies
found a revolver or pistol inside the trunk of the car.

15

(Lodged Document 6 at 2-5).

## B.  Procedural History

16

17

18

19

20

21

22

    After a jury trial in the Sacramento County, California
Superior Court, the Petitioner was found guilty of assault with
a firearm;[1] possession of a firearm by a convicted felon[2],
carrying a concealed weapon;[3] and discharging a firearm in a
grossly negligent manner.[4]  (Lodged Document 1 at 271-272, 274-
277.) On February 25, 2005, he was sentenced to seventeen years of

23

24

    [1]in violation of Cal. Penal Code, § 245, subd. (a)(2)

25

    [2]in violation of Cal. Penal Code, § 12021, subd. (a)(1)

26

    [3]in violation of Cal. Penal Code § 12025, subd. (b)(6)

27

28

    [4]in violation of Cal. Penal Code § 246.3

REPORT AND RECOMMENDATION TO DENY
WRIT OF HABEAS CORPUS
- 4 -

confinement.  (Lodged Document 2 at 319-320.)

The Petitioner appealed to the California Court of Appeal, Third Appellate District.  (Lodged Document 2 at 321-322.)  On April 25, 2006, the Third District Court of Appeal issued an unpublished opinion affirming Petitioner's conviction and sentence. (Lodged Document 6.)  Petitioner then filed a petition for review in the California Supreme Court. (Lodged Document 7.) Petitioner presented the following issues to the California Supreme Court following his appeal:

> (1) Was the defendant denied his fourth amendment right to be free from unreasonable searches and seizures?
>
> (2) Did prosecutorial misconduct deprive the defendant of his rights to due process and a fair trial?
>
> (3) Did insufficient evidence of a prior conviction deprive defendant of his right to due process?

(Lodged Document 7 at 6, 13, 20.)

The California Supreme Court denied Mr. Glass's petition for review on June 28, 2006. (Lodged Document 8.) On November 15, 2006, Mr. Glass filed his petition for writ of habeas corpus with this Court.  (Ct. Rec. 1.)

In his federal habeas petition, Mr. Glass raises the same three issues as those raised in the state's highest court. (*Cf*. Ct. Rec. 1 at 5-6 *with* Ct. Rec. 1, Exhibit E at 6, Exhibit F at 13, and Exhibit G at 20.)


## II. EXHAUSTION OF STATE REMEDIES

As a preliminary issue, Petitioner must have exhausted his state remedies before seeking habeas review.  The federal courts are not to grant a writ of habeas corpus brought by a

REPORT AND RECOMMENDATION TO DENY
WRIT OF HABEAS CORPUS

person in state custody pursuant to a state court judgment unless 'the applicant has exhausted the remedies available in the courts of the State.' *Wooten v. Kirkland*, 540 F. 3d 1019, 1023 (9th Cir. 2008), citing 28 U.S.C. §2254(b)(1)(A). "This exhaustion requirement is 'grounded in principles of comity' as it gives states 'the first opportunity to address and correct alleged violations of state prisoner's federal rights.'" *Id.*, citing *Coleman v. Thompson*, 501 U.S. 722, 731 (1991).

In order to exhaust state remedies, a petitioner must have raised the claim in state court as a federal claim, not merely as a state law equivalent of that claim. See *Duncan v. Henry*, 513 U.S. 364, 365-66 (1995). The state's highest court must be alerted to and given the opportunity to correct specific alleged violations of its prisoners' federal rights. *Id.*, citing *Picard v. Connor*, 404 U.S. 270, 275 (1971). To properly exhaust a federal claim, the petitioner is required to have presented the claim to the state's highest court based on the same federal legal theory and the same factual basis as is subsequently asserted in federal court. *Hudson v. Rushen*, 686 F. 2d 826, 829-30 (9th Cir. 1982), *cert. denied*, 461 U. S. 916 (1983).

Respondent may waive the exhaustion requirement. *See* 28 U.S.C. § 2254 (b)(3) ("A state shall not be deemed to have waived the exhaustion requirement or be estopped from reliance on the requirement unless the state, through counsel, expressly waives the requirement.") In his answer to the petition, Respondent affirmatively alleged "Respondent admits that Petitioner has exhausted claims one and two of his petition." (Ct. Rec. 16 at

REPORT AND RECOMMENDATION TO DENY
WRIT OF HABEAS CORPUS
- 6 -

2.)  This clearly constitutes an express waiver by counsel of the exhaustion requirement of claims one and two.  *See Dorsey v. Chapman*, 262 F. 3d 1181, 1187 at n. 8 (11th Cir. 2001). Generally, a habeas court may, in its discretion reach the merits of a habeas claim or may insist on exhaustion of state remedies despite a State's waiver of the defense.  *See Boyd v. Thompson*, 147 F. 3d 1124, 1127 (9th Cir. 1998).  The court's discretion should be exercised to further the interests of comity, federalism, and judicial efficiency.  *See id.*  It appears to advance the interests of the parties and judicial efficiency (without unduly offending the interests of either comity or federalism) for the Court to decide claims one and two on the merits.

Respondent concedes that because Petitioner has properly exhausted federal habeas claims 1 and 2, the federal court should consider the claims but deny them on the merits. (Ct. Rec. 16 at 2).  Respondent argues that claim 3 should be denied because, although presumptively unexhausted, the Court may nonetheless deny a claim when, as alleged, it is clear no colorable federal claim is presented.  (Ct. Rec. 16 at 2, citing 28 U.S.C. § 2254(b)(2); *Cassett v. Stewart*, 406 F. 3d 614, 624 (9th Cir. 2005).)

Federal habeas claim one  Mr. Glass's first federal habeas claim is that his Fourth Amendment rights were violated when he was illegally searched and detained.  (Ct. Rec. 1 at 5.)  In his petition for review in the California Supreme Court, Mr. Glass presented the claim as it appears in the habeas petition ("The denial of Appellant's motion to suppress was erroneous as the

REPORT AND RECOMMENDATION TO DENY
WRIT OF HABEAS CORPUS
- 7 -

detention and search of Appellant was unreasonable under the Fourth Amendment.") (Ct. Rec. 1 at Exhibit E at 6; Ct. Rec. 1 at 5.)  The petitioner cited federal case law in support of his argument.  (Ct. Rec. 1, Exhibit E at 12.)  In both the state and federal petitions, Petitioner contests his detention and search.

Respondent is correct that Mr. Glass exhausted his first federal habeas claim, because he raised the issue based on the same facts in both the state's highest court and the federal court, and raised it in the state's highest court invoking the same federal legal protections.  *See* merits herein.

Federal habeas claim two  Mr. Glass's second federal habeas claim is that prosecutorial misconduct during closing argument deprived him of his rights to due process and a fair trial. (Ct. Rec. 1 at 5.) In the state's highest court, Mr. Glass raised the issue the same way and relied on the same facts.  (Ct. Rec. 1, Exhibit F at 13.)  Mr. Glass cited federal constitutional provisions and federal case law in support of the argument to the state's highest court.  (Ct. Rec. 1, Exhibit F at 15.) Respondent is correct that Mr. Glass exhausted his second federal habeas claim.  *See* merits herein.

Federal habeas claim three  Mr. Glass's third federal habeas claim is that the trial court violated his right to due process because it relied on insufficient evidence of his alleged prior conviction when he was convicted on the instant charges. (Ct. Rec. 1 at 6.) Mr. Glass raised the same claim as a due process violation in the state supreme court. And although he raised the sufficiency of the evidence of his prior conviction in the Court

1  of Appeal, he did not raise as a due process violation but as a
2  violation of double jeopardy.  Respondent admits that this claim
3  is presumptively unexhausted.

4       Mixed petitions

5       Prior to enacting AEDPA, *Lundy* held that federal district
6  courts may not adjudicate mixed petitions for habeas corpus,
7  that is, petitions containing both exhausted and unexhausted
8  claims.  *Rhines v. Weber*, 544 U.S. 269, 273-274 (2005), citing
9  *Rose v. Lundy*, 455 U.S. 509 (1982).  In 1996, AEDPA added a
10 one-year statute of limitations on filing federal habeas
11 petitions.  28 U.S.C. § 2244(d).  As a result of the
12 interplay between AEDPA's 1-year statute of limitations and
13 *Lundy's* dismissal requirement, petitioners who come to federal
14 court with "mixed" petitions run the risk of forever losing their
15 opportunity for any federal review of their unexhausted claims.
16 *Rhines,* 544 U.S. at 274-275.  Accordingly, courts have adopted a
17 "stay and abeyance" procedure where, rather than dismiss the mixed
18 petition pursuant to *Lundy*, a district court might stay the
19 petition and hold it in abeyance while the petitioner returns to
20 state court to his exhaust his previously unexhausted claims.
21 Once the state remedies are exhausted, the district court lifts
22 the stay and allows the petition to proceed in federal court.
23 *Rhines,* 544 U.S. at 275-276.

24      A district court is permitted to stay a mixed petition --
25 a petition containing both exhausted and unexhausted claims --
26 in "limited circumstances," so that a petitioner may present his
27 unexhausted claims to the state court without losing his right to

28

REPORT AND RECOMMENDATION TO DENY
WRIT OF HABEAS CORPUS
- 9 -

1   federal habeas review due to the relevant one-year statute of
2   limitations.  *Wooten,* 540 F. 3d at 1023, citing *Rhines,* 544 U.S.
3   at 273-275, 277-278 (2005).  In *Rhines,* the U.S. Supreme Court
4   stated that "stay and abeyance is only appropriate when the
5   district court determines there was good cause for the
6   petitioner's failure to exhaust his claims first in state court."
7   *Id.,* citing *Rhines*, 544 U.S. at 277.  Under *Rhines*, a district
8   court must stay a mixed petition only if: (1) the petitioner has
9   "good cause" for his failure to exhaust his claims in state court;
10  (2) the unexhausted claims are potentially meritorious; and (3)
11  there is no indication that the petitioner intentionally engaged
12  in dilatory litigation tactics.  *Wooten*, 540 F. 3d at 1023, citing
13  *Rhines*, 544 U.S. at 278.  The *Wooten* court continued:

> Wooten argues that he was entitled to a stay under
> *Rhines* so that he could exhaust his cumulative error
> claim. We hold that the district court did not abuse
> its discretion in concluding that Wooten did not have
> 'good cause' for failing to exhaust his cumulative error
> claim. As a result, we need not reach the other two
> factors in the *Rhines* test.

18  *Wooten*, 540 F. 3d at 1023

19      Like Mr. Wooten, Mr. Glass has not shown good cause for
20  failing to exhaust his third claim.  Accordingly, it is not
21  appropriate for the court to stay his third claim pending
22  exhaustion in state court.

23  **III. PROCEDURAL DEFAULT**

24      As noted, Petitioner has exhausted his first two federal
25  habeas claims.  With respect to claim three, the "procedural
26  default doctrine 'bar[s] federal habeas [review] when a state
27  court declined to address a prisoner's federal claims because the
28

1  prisoner had failed to meet a state procedural requirement.'"
2  *Calderon v. United States District Court*, 96 F. 3d 1126, 1129 (9th
3  Cir. 1996)(quoting *Coleman v. Thompson*, 501 U.S. 722, 729-30
4  (1991).  This doctrine applies when: (1) a state court has been
5  presented with a federal claim, but declined to reach the issue
6  pursuant to an independent and adequate state procedural rule, or
7  when (2) it is clear that the state court would hold the claim
8  procedurally barred.  *Harris v. Reed*, 489 U.S. 255, 260-263
9  (1989).  This Court may not reach the merits of procedurally
10 defaulted claims, that is, claims "in which the petition failed to
11 follow applicable state procedural rules in raising the claims"[.]
12 *Sawyer v. Whitley*, 505 U.S. 333, 338 (1992), citing *Murray v.*
13 *Carrier*, 77 U.S. 478 (1986).

14      The California Supreme Court and case law procedurally bar
15 the California Supreme Court from considering an issue not raised
16 in the Court of Appeal.  *See* Cal. Rule of Court 8.500(c)(1)[5]; *In*
17 *re Harris*, 5 Cal 4th 813, 824 (1993) (acknowledging the court's
18 analysis also applies to the so-called "*Dixon* rule," which
19 generally prohibits raising an issue in a postappeal habeas corpus
20 petition when that issue was not, but could have been, raised on
21 appeal). *Harris*, 5 Cal 4th at 824, referring to *In re Dixon* (1953)
22 41 Cal.2d 756. Although Mr. Glass argued to the Court of Appeal
23 that evidence of the prior conviction was insufficient, he did not
24 raise it as a due process violation.  In the Court of Appeal he

25 _____
       [5]
26 As a policy matter, on petition for review the Supreme Court
   normally will not consider an issue that the petitioner failed
27 to timely raise in the Court of Appeal. Cal. Rules of Court,
   Rule 8.500(c)(1).
28
REPORT AND RECOMMENDATION TO DENY
WRIT OF HABEAS CORPUS
- 11 -

1  cast the claim as a violation of double jeopardy, while in the
2  California Supreme Court for the first time he argued it was a due
3  process violation.

4      On review of a habeas petition the court asks whether Rule
5  8.500(c)(1) and the so-called *Dixon* rule comprise an independent
6  and adequate state procedural ground barring habeas relief.

7      In order for a state procedural rule to bar a federal claim,
8  the state rule must be independent of federal law, *see Park v.*
9  *California*, 202 F. 3d 1146, 1151-1152 (9th Cir. 2000), firmly
10  established at the time of the default, *see Ford v. Georgia*, 498
11  U.S. 411, 412 (1991), and regularly applied by the state.  *See*
12  *Johnson v. Mississippi*, 486 U. S. 578, 579 (1988).  In the present
13  case, the *Dixon* rule generally prohibiting  raising an issue in a
14  postappeal habeas corpus petition when that issue was not, but
15  could have been, raised on appeal, is settled law in California.
16  *See In re Harris,* 5 Cal.4th 813, 824 at n3 (1993); *People v.*
17  *Sumstine*, 36 Cal.3d 909, 920 (1984); *In re Dixon*, 41 Cal.2d 756,
18  759 (1953).

19      Procedural default is excused if "the prisoner can
20  demonstrate cause for the default and actual prejudice as a result
21  of the alleged violation of federal law, or demonstrate that
22  failure to consider the claims will result in a fundamental
23  miscarriage of justice."  *Coleman*, 501 U.S. at 750.  Cause "must
24  be something external to the petitioner, something that cannot
25  fairly be attributed to him." *Id*. at 753 (internal citation
26  omitted).  A "fundamental miscarriage of justice" occurs when "a
27  constitutional violation has probably resulted in the conviction

28

REPORT AND RECOMMENDATION TO DENY
WRIT OF HABEAS CORPUS
- 12 -

1  of one who is actually innocent[.]"  *Murray v. Carrier*, 477 U.S.
2  478, 495-96 (1986).

3       Petitioner does not attempt to prove cause and prejudice, or
4  make a colorable showing of actual innocence sufficient to excuse
5  his default with respect to his failure to raise the same federal
6  claim to the Court of Appeal as he presented later to the state's
7  highest court.  An independent review of the record does not show
8  that "cause and prejudice" are established for purposes of
9  excusing the procedural default.  Nor does the record reveal a
10  colorable showing of actual innocence sufficient to excuse
11  Petitioner's procedural default.

12       Respondent asserts the Court can consider claim three,
13  despite Petitioner's procedural default in state court, because
14  no colorable federal claim has been presented.  (Ct. Rec. 16 at 2,
15  22-23.)  Mr. Glass failed to raise his third habeas claim in the
16  Court of Appeal as a due process violation, barring review on that
17  basis by the California Supreme Court.  He fails to establish any
18  of the applicable exceptions for the default.  Accordingly, claim
19  three should be denied as procedurally barred.  Alternatively, a
20  brief review of the merits also indicates the claim should be
21  denied.

22  **IV. MERITS**

23  **A.   Standard of Review**

24       Under the Anti-Terrorism and Effective Death Penalty Act
25  (AEDPA), a federal court may grant habeas relief if a state court
26  adjudication resulted in a decision that was contrary to, or
27  involved an unreasonable application of clearly established

28

REPORT AND RECOMMENDATION TO DENY
WRIT OF HABEAS CORPUS
- 13 -

federal law, as determined by the Supreme Court of the United States, or resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence. 28 U.S.C. § 2254 (d).  "AEDPA does not require a federal habeas court to adopt any one methodology in deciding the only question that matters under § 2254(d)(1) - whether a state court decision is contrary to, or involved an unreasonable application of, clearly established federal law."  *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003), referring to  *Weeks v. Angelone*, 528 U.S. 225 at 237 (2000).  Where no decision of the Supreme Court "squarely addresses" an issue or provides a "categorical answer" to the question before the state court, § 2254(d)(1) bars relief.  *Moses v. Payne*, 543 F. 3d 1090, 1098 (9th Cir. 2008), relying on *Wright v. Van Patten*, __ U.S. __, 128 S. Ct. 743, 746 (2008); *Carey v. Musladin*, 549 U.S. 70 (2006).

Federal courts apply the *Brecht* standard to determine whether a constitutional error was harmless.  *Fry v. Pliler,* 551 U.S. 112 (2000)*; Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993).  Habeas relief is warranted only if the error had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht,* 507 U.S. at 637 ((citing *Kotteakos v. United States,* 328 U.S. 750, 776 (1946)); *Bains v. Cambra*, 204 F. 3d 964, 977-78 (9th Cir.) *cert. denied*, 531 U.S. 1037 (2000)).  That is, the Petitioner is entitled to habeas relief only if he can show that any constitutional violation "resulted in actual prejudice." *Brecht,* 507 U.S. at 638 (internal citation omitted).

**B.  Claim 1: Fourth Amendment Violation**

REPORT AND RECOMMENDATION TO DENY
WRIT OF HABEAS CORPUS
- 14 -

1     The Petitioner claims that the trial court erred by denying

2  his suppression motion.  (Ct. Rec. 1 at 5.)  The Court of Appeal

3  analyzed the issue as follows:

4          On December 17, 2004, defendant filed a motion
       to suppress evidence pursuant to Penal Code section
5       1538.5. Defendant sought to suppress the firearm and
       bullets found in his car, as well as any information
6       relating to the gunshot residue testing the police
       performed on him.
7
           Defendant based his motion to suppress on five
8       arguments: (1) "the detention violated the Fourth
       Amendment because the officers lacked sufficient
9       information to identify the defendant as a person
       involved in criminal activity"; (2)"the pat-down was
10      unlawful because the officer did not have a reasonable
       suspicion that defendant was armed";(3) "even if the
11      initial detention was permissible, the subsequent search
       was unlawful because it was the result of an unduly
12      prolonged detention"; (4) "the proper standard for
       determining the legality of a parole search under the
13      Fourth Amendment of the United States Constitution is
       'reasonable suspicion'"; and (5) "the parole search of
14      he defendant was conducted without 'reasonable suspicion'
       and was therefore illegal."
15
           On January 5, 2005, the trial court denied
16      defendant's motion to suppress.  The court found there was
       a "very powerful description" of the suspect based on "a
17      specific reference to a specific person."  According to
       the court, the description of the suspect was consistent
18      with the defendant's size and age.  Furthermore, the
       defendant had the "appropriate black leather jacket" and
19      was "clearly connected to apartment eight."  Thus, the
       court was of the opinion that "an officer would have been
20      justified in making an arrest based solely on finding
       [defendant] there in that situation."
21
           Although the deputies did not arrest defendant upon
22      their initial contact with him, the court found "[t]here
       certainly was a basis for a significant detention to
23      investigate."  Furthermore, the court concluded the deputies
       had a right to search defendant once they learned he was on
24      parole.  The court acknowledged that all parolees are
       searchable and the deputy believed he could search defendant
25      freely once he knew defendant was on parole.  Thus, it was
       permissible, based on defendant's parole status, to perform
26      gunshot residue testing on defendant and to search
       defendant's car.  Accordingly, the court determined all of
27      the deputies' actions were lawful and found "no basis" to
       suppress any of the evidence.
28

REPORT AND RECOMMENDATION TO DENY
WRIT OF HABEAS CORPUS
- 15 -

1

(Lodged Document 6 at 5-7.)

2

3      The California Supreme Court's ruling denying review

(Lodged Document 8) also rejected Mr. Glass's first habeas

4

claim.

5

6      In its unpublished opinion, the Court of Appeal concluded

that the evidence supported the trial court's finding:

7

8          When reviewing a trial court's denial of a motion to
       suppress, "We defer to the trial court's factual findings,
       express or implied, where supported by substantial
9      evidence.  In determining whether, on the facts so found,
       the search or seizure was reasonable under the Fourth
10     Amendment, we exercise our independent judgment."
       (*People v. Glaser*, 11 Cal.4th 354, 362 (1995)).

11

12         On appeal, defendant contends, "the trial court erred
       in denying the suppression motion because the prosecution
13     did not prove that the parole search of appellant was not
       unconstitutionally arbitrary."  A portion of this argument,
       however, is premised on defendant's assertion that Deputy
14     "McCowan was not justified in holding appellant for nearly
       and [sic] hour and twenty minutes before making any
15     determination as to his status."  FN2 As far as we can
       discern, this latter argument attacks the length of the
16     detention as unreasonable, not whether the parole search
       was arbitrary.  Accordingly, it should be separately
17     designated under its own heading. (See Cal. Rules of
       Court, rule 14(a)(1)(B) [an appellant must "state each
18     point under a separate heading or subheading summarizing
       the point, and support each point by argument"].)
19     Nonetheless, we will analyze the two arguments
       individually.

20

21         FN2.  Defendant's counsel conflates the two separate
       protections of the Fourth Amendment "against unreasonable
       searches and seizures."  (U.S. Const., 4th Amend.)  A
22     portion of defendant's opening brief reads: "Where the
       motivation is unrelated to rehabilitative and reformative
23     purposes or legitimate law enforcement purposes, the
       *search* is 'arbitrary' . . . Therefore, the prolonged
24     *detention* of appellant would be 'arbitrary.'" (Italics
       added.) However, a search and detention are not the same,
25     nor are they subject to the same analysis.  (*See e.g.,
       Florida v. Royer*, 460 U.S. 491, 497-501 (1983)).
26     [additional citation omitted.]

27                                 A.

28

REPORT AND RECOMMENDATION TO DENY
WRIT OF HABEAS CORPUS
- 16 -

1                           *The Detention*

2          "Police contacts with individuals may be placed
   into three broad categories ranging from the least to
3  the most intrusive: consensual encounters that result
   in no restraint of liberty whatsoever; detentions, which
4  are seizures of an individual that are strictly limited
   in duration, scope, and purpose; and formal arrests or
5  comparable restraints on an individual's liberty."
   (*In re Manuel G.*, 16 Cal.4th 805, 821 (1997)).

6
          The People concede Deputy McCowan's initial contact
7  with defendant was a detention; however, they assert it
   was justified by the suspicion raised by "appellant's
8  appearance matching that of the shooting suspect."

9          "The Fourth Amendment to the United States
   Constitution prohibits seizures of persons, including
10 brief investigative stops, when they are 'unreasonable.'"
   (*People v. Souza*, 9 Cal.4th 224, 229 (1994).) "A
11 detention is reasonable under the Fourth Amendment when
   the detaining officer can point to specific articulable
12 facts that, considered in light of the totality of the
   circumstances, provide some objective manifestation that
13 the person detained may be involved in criminal activity."
   (*Id.*, at 231.)

14
          Sacramento County Sheriff's deputies responded to
15 a 911 call reporting that a person had been shot.  While
   deputies surveyed the apartment complex parking lot near
16 the scene of the crime, they encountered only two individuals
   -- defendant and his girlfriend.  Deputy McCowan testified
17 defendant matched the description of the shooting suspect he
   received from dispatch -- black male adult, five feet seven
18 inches to five feet nine inches tall, with a heavy build,
   wearing a black leather jacket
19 and dark jeans.  The description of the shooter was received
   from an identified source, a witness to the shooting who
20 provided her name and apartment number.  Because defendant
   matched the precise description of the shooting suspect,
21 which was received from a reliable source, Deputy McCowan
   clearly had sufficient reason to believe defendant was
22 involved in criminal activity to justify the initial
   detention.

23
          Defendant further argues that Deputy McCowan was not
24 justified in holding him for 1 hour and 20 minutes.
   However, "'[t]here is no hard and fast line to distinguish
25 permissible investigative detentions from impermissible
   de facto arrests.  Instead the issue is decided on the
26 facts of each case, with focus on whether the police
   diligently pursued a means of investigation reasonably
27 designed to dispel or confirm their suspicions quickly,
   using the least intrusive means reasonably available

28
REPORT AND RECOMMENDATION TO DENY
WRIT OF HABEAS CORPUS
- 17 -

1    under the circumstances.'" (*People v. Celis*, 33 Cal.4th
     667, 674-675 (2004)).  In making this determination, it
2    is important to examine the "'duration, scope and purpose'
     of the stop."  (*Ibid.*)
3
        Deputy McCowan made initial contact with defendant
4    at approximately 1:25 a.m.  He asked defendant to remove
     his hands from his pockets and performed a brief patsearch
5    for weapons with defendant's consent.  Even without
     defendant's consent to the frisk, this was an entirely
6    permissible action to ensure officer safety, given that
     defendant matched the description of the shooter and
7    considering the violent nature of the crime under
     investigation.  (*See Terry v. Ohio*, 392 U.S. 1, 30 (1968)).
8
9        Subsequently, Deputy McCowan requested that defendant
     provide him with identification and proceeded to ask
10   defendant whether he knew of the earlier altercation at
     the apartment.  During their conversation, defendant told
11   Deputy McCowan that he was headed to the same apartment
     number linked to the shooting suspect, furnishing
12   additional reason to believe defendant was involved in
     the shooting. (*See People v. Russell*, 81 Cal. App.4th 96,
13   102 (2000)["Circumstances which develop during a detention
     may provide reasonable suspicion to prolong the detention"].)
14   At this point there was compelling evidence linking defendant
     to the shooting, arguably sufficient to arrest defendant, but
15   clearly enough to detain him for further investigation.
16       At approximately 1:45 a.m., Deputy McCowan received
     information from the background check he requested on
17   defendant, at which time he learned defendant was on
     parole.  Subsequently, around 1:50 a.m., Deputy McCowan
18   informed his sergeant of the current situation.  The
     sergeant replied that he was talking to the witnesses
19   and inquiring into doing a field show up to get a
     positive identification whether defendant was the
20   shooter.  It was not until 2:10 or 2:15 a.m. that Deputy
     McCowan learned the witnesses were fearful for their
21   safety and declined to do a field show up.  During the
     time Deputy McCowan was awaiting the field show up, and
22   after learning it would not happen, the other deputies
     on the scene continued to investigate the crime.  All of
23   these procedures were aimed at confirming or dismissing
     whether it was defendant who was involved in the
24   shooting.  It was proper for the deputies to attempt to
     have the eyewitnesses identify defendant as the shooter,
25   or exculpate him from involvement. When this alternative
     appeared fruitless, the deputies continued their
26   investigation and pursued other avenues.
27       Approximately five minutes after learning there
     would be no field show up, a crime scene investigator
28

REPORT AND RECOMMENDATION TO DENY
WRIT OF HABEAS CORPUS
- 18 -

took gunshot residue samples from defendant. This action constituted a search of defendant, as further discussed below.  Although the results would not be immediately available to confirm whether defendant was involved in the shooting, it did preserve potential evidence and lasted only 10 minutes.  Thus, the procedure did not unreasonably prolong the detention.

Finally, Deputy McCowan contacted defendant's parole agent, Eric Sakazaki, to request he place a parole hold on defendant given the circumstances of the crime, including defendant's appearance and statements making it likely he was the suspected shooter.  Agent Sakazaki placed a parole hold on defendant at approximately 2:44 a.m.

Throughout each step of the investigatory detention, deputies acted in an effort to confirm or dispel suspicion that defendant was the suspected shooter. There was no unreasonable period of inactivity where the deputies failed to diligently pursue their investigation. Nothing was unreasonable about the scope of the detention, as it appears from the record that Deputy McCowan conversed with defendant throughout the entire process, without ever restraining him or using force.  In addition, considering the nature of the crime and how closely defendant matched the description of the shooter, it would have been irrational for deputies to release defendant without completing their investigation.

The United States Supreme Court has continually recognized that a seizure is not unreasonable merely because "the protection of the public might, in the abstract, have been accomplished by 'less intrusive' means." (*Cady v. Dombrowski*, 413 U.S. 433, 447 (1973); *United States v. Montoya De Hernandez*, 473 U.S. 531, 542 (1985)).  "The question is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or to pursue it." (*United States v. Sharpe*, 470 U.S. 675, 687 (1985)). Considering the totality of the circumstances, we do not find Deputy McCowan acted unreasonably by detaining defendant to investigate a violent shooting where defendant was a near perfect match to the eyewitness description of the suspected shooter.

B.

*The Search*

Defendant further argues the trial court erred by denying his motion to suppress evidence because "the prosecution failed to prove that the parole search was not unconstitutionally arbitrary." Defendant contends

REPORT AND RECOMMENDATION TO DENY
WRIT OF HABEAS CORPUS
- 19 -

1    the prosecution failed to prove, through objective facts,
     that Deputy McCowan's motivation in conducting the parole
2    search "'could have been related' to rehabilitative and
     reformative purposes or legitimate law enforcement
3    purposes."  We disagree.

4         The Fourth Amendment to the United States Constitution
     protects against unreasonable searches, in addition to
5    unreasonable seizures. (U.S. Const., 4th Amend.) A
     warrantless search is presumed to be unreasonable, unless
6    the search meets one of the few recognized exceptions.
     (*Minnesota v. Dickerson*, 508 U.S. 366, 372 (1993)).  The
7    search of a parolee is one such exception.  (See *United
     States v. Knights*, 534 U.S. 112, 121 (2001); *People v.*
8    *Reyes*, 19 Cal.4th 743, 753 (1998)).

9         In *Reyes*, the California Supreme Court held that,
     even in the absence of particularized suspicion, a parole
10   "search is reasonable within the meaning of the Fourth
     Amendment as long as it is not arbitrary, capricious or
11   harassing."  (*People v. Reyes, supra*, 19 Cal.4th at 753.
     Deputy McCowan learned defendant was on parole at
12   1:45 a.m. Neither party disagrees that the gunshot residue
     testing of defendant constituted a search of his person.
13   However, this occurred at approximately 2:20 a.m., well after
     Deputy McCowan learned defendant was on parole.  Deputy
14   McCowan searched defendant's pockets and removed a
     set of keys and keyless remote to defendant's car, which
15   deputies attempted to use to locate the car.  Both the
     search of defendant's pockets and subsequent search of
16   his car occurred after deputies learned that defendant
     was on parole. Thus, there were all valid parole searches
17   so long as they were conducted for a proper purpose.  FN3

18        FN3. The search of defendant's pocket could have
     been justified as an inventory search and the search of
19   defendant's car could have been justified by probable
     cause based on information supplied by defendant's
20   girlfriend implicating him in the shooting. Because we
     find all were parole searches, we need not reach the
21   remaining justifications.

22        Defendant concedes the parol search was conducted for
     the purpose of locating the shooter and investigating a
23   serious crime. Nonetheless, he argues "[s]ince the
     prosecution clearly failed to justify the parole search
24   with evidence that Deputy McCowan's motivation was or
     could have been related to rehabilitative and reformative
25   purposes or legitimate law enforcement purposes, the
     trial court should have found the parole search
26   unconstitutionally arbitrary." This argument makes no sense.

27        Deputy McCowan clearly had a legitimate law
     enforcement purpose to justify each search of defendant's
28

REPORT AND RECOMMENDATION TO DENY
WRIT OF HABEAS CORPUS
- 20 -

person and property. Deputies were investigating the violent shooting of a person. They found defendant near the scene of the crime, early in the morning, clearly matching the description of the shooter they received from an identified eyewitness who called 911. While performing a records check on defendant, Deputy McCowan learned defendant was on parole. Based on all of this information, there was nothing "arbitrary or capricious" about the parole search of the defendant. (*People v. Reyes, supra*, 19 Cal.4th at 753-754, citing *In re Anthony S.*, 4 Cal. App.4th 1000, 1004 (1992) ["a search is arbitrary and capricious when the motivation for the search is unrelated to rehabilitative, reformative or legitimate law enforcement purposes, or when the search is motivated by personal animosity toward the parolee"].) Deputy McCowan had reason to believe defendant was involved in the shooting. He knew defendant was on parole. Therefore, the parole searches were performed for the legitimate law enforcement purpose of investigating the shooting. Accordingly, we conclude the denial of defendant's motion to suppress was proper.

(Lodged Document 6 at 11-19.)

Pursuant to 28 U.S.C. § 2254(e)(1), if a habeas petitioner is in state custody pursuant to a state court judgment, the determination of a factual issue made by a state court shall be presumed to be correct. *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003), citing 28 U.S.C. § 2254(e)(1).

Where the state affords a defendant the opportunity for a full and fair consideration of Fourth Amendment search and seizure claims, this Court is precluded from reviewing those claims in a federal habeas proceeding. *Stone v. Powell*, 428 U.S. 465, 494-495 (1976).

Through counsel Mr. Glass moved the trial court to suppress evidence obtained as a result of what he alleged was an unconstitutional detention and search. The trial court conducted a hearing and denied the motion. Mr. Glass again raised his suppression arguments on appeal to the Court of Appeal and to the California Supreme Court. Accordingly, the record supports the

REPORT AND RECOMMENDATION TO DENY
WRIT OF HABEAS CORPUS
- 21 -

conclusion that Mr. Glass had adequate opportunity to litigate his claim in state court and that he, in fact, took full advantage of that opportunity.

As a matter of federal law, *Stone v. Powell* forecloses the habeas court's inquiry into the state court's subsequent course of action when as here, the petitioner has been given the initial opportunity for a fair hearing in the state court with respect to Fourth Amendment claims.  *Stone*, 428 U.S. at 494-495; *see also Wainwright v. Witt*, 469 U.S. 412, 426 (1985); *Caldwell v. Cupp*, 781 F. 2d 714, 715 (9th Cir. 1986).  The record supports the conclusion that Mr. Glass was provided a full and fair opportunity to litigate his Fourth Amendment claims in the state court; accordingly, the first claim is without merit as a matter of federal law.  Additionally, Petitioner does not show the state court's decision was contrary to, or involved an unreasonable application of, clearly established federal law, or resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence.  *See e.g., Lockyer v. Andrade*, 538 U.S. 63, 70-71 (2003).  Petitioner's first claim is therefore without merit.

**C.  Habeas Claim 2: Prosecutorial Misconduct**

The Petitioner claims that the prosecutor's closing argument amounted to misconduct which deprived him of his rights to due process and a fair trial. (Ct. Rec. 1 at 5).  The first comments at issue are described as the burden shifting argument:

> <u>Prosecution</u>: Now admittedly, you know, when each witness looks at this overhead diagram, do you get a Victoria Thomas down here further to the south, do you get a Jimmy Yarbrough up here further to the north and Niko Housely in the middle?

REPORT AND RECOMMENDATION TO DENY
WRIT OF HABEAS CORPUS
- 22 -

Absolutely. You know what? Thank goodness. Thank goodness they're -- to use their words -- all over the board. That shows us that they are not putting their heads together and cooking this thing up. Thank goodness there are inaccuracies or discrepancies in their testimony. They're thinking back of things that happened in September, and they're giving us their honest answer of where they remember the people.

*But the thing about this thing that they can't answer* and that there is no answer for is that the two groups of people don't talk.

<u>Defense</u>: I'm going to object, your Honor. I think that shifts the burden.

<u>Court</u>: What?

<u>Defense</u>: It shifts the burden to the defense to prove lack of guilt.

<u>Court</u>: No, I don't sense that is what the argument is doing. *Obviously the burden is on the People*, but I don't think that argument shifts the burden. It is acceptable comment.

You may proceed.

<u>Prosecution</u>: This is the People's opportunity to respond to argument. *They have not explained anything and they don't have to explain anything*. They can sit down there and shut their mouth and not argue a word . . .

(Lodged Document 11 at 889-890)(emphasis added).

The second argument to which Petitioner objects is referred to as the public policy argument:

<u>Prosecution</u>: The district attorney's office did not take care of the warrants in the sense of the warrants being gone. We simply showed her where she needs to go to get the matter handled. So it's not like she's been given a free pass through these warrants.

And the other thing is we're talking about a misdemeanor false statement to a police officer. Is it a good thing to lie to the police? Absolutely not. But when you look at what she's a witness to, she's a witness to a shooting. She's a witness to a man who got shot walking down the street for no reason. Are we going to give her immunity? You bet we are. We'll do it today and we'll do it tomorrow. That's the right thing to do. If you don't get that testimony out, we don't know what happens. *If we don't know what happens, we can't convict people that are out shooting innocent people on the*

REPORT AND RECOMMENDATION TO DENY
WRIT OF HABEAS CORPUS
- 23 -

*street.*

Defense: Objection, your Honor.

Prosecution: So that's --

Defense: Objection. That has to do with policy issues, and you can't convict people out on the street. I think we have to focus on the facts of this case.

Court: Well, no. The objection is overruled.

Prosecution: With respect --

Court: Well, obviously -- *obviously you're not going to convict someone as a matter of policy* because people do get shot in the streets. That obviously – the issue in this case is, is there evidence that proves and satisfies the jury. . . *I'll permit the argument but emphasize you're not to decide this case on public policy or because of the perception of crime on the street.*

(Lodged Document 11 at 891-892)(emphasis added).

The analysis by the Court of Appeal stated:

Defendant claims that during closing argument, the "prosecutor . . . committed misconduct by shifting the burden of proof to [defendant] to prove his innocence and urging the jury to convict [defendant] to send a message that society will not tolerate people shooting innocent victims on the street." We find neither of the prosecutor's statements, taken in context, constituted misconduct.

"A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process. Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury. Furthermore, and particularly pertinent here, when the claim focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." (*People v. Morales*, 25 Cal.4th 34,44 (2001).) Acts of prosecutorial misconduct do not justify reversal of a defendant's conviction "unless it is reasonably probable that a result more favorable to the defendant would have been reached without the misconduct." (*People v. Crew*, 31 Cal.4th 822, 839 (2003).)

Regarding the burden-shifting argument, defendant

REPORT AND RECOMMENDATION TO DENY
WRIT OF HABEAS CORPUS
- 24 -

specifically stresses the alleged impropriety of the
following statement by the prosecutor: "But the thing
about this thing that they can't answer and that there is
no answer for is that the two groups of people don't talk."
The prosecutor concluded this line of argument by stating:
"This is the People's opportunity to respond to argument.
They have not explained anything *and they don't have to
explain anything*. FN4 They can sit down there and shut
there mouth and not argue a word." (Italics added.) However,
we cannot view these statements in isolation; instead we must
evaluate them in the context in which they were made. (*People
v. Morales*, *supra*, 25 Cal.4th at 46.)

     FN4. We note in an argument on misconduct, defendant's
opening brief failed to include the italicized portion of
the prosecutor's argument, making the statement appear far
worse that the argument actually before the jury.

     Here, the prosecutor sought to rebut defendant's
accusation that the testimony of the eyewitnesses was
inconsistent and essentially fabricated. The prosecutor
made the above statements to demonstrate that if the jury
viewed defendant's ex-girlfriend and the other two
eyewitnesses as being in two separate groups, it would be
impossible for the two groups to fabricate such similar
stories because they did not talk to each other. Thus, these
statements did not even address defendant's guilt, but rather
the claim of collusion concerning the People's eyewitnesses.
Moreover, while overruling defendant's objection to the
statement, the court made it clear that the burden was on the
People. Following defendant's objection, even the prosecutor
made clear that the defendant had no duty to explain anything
or make any argument. Clearly, there is no likelihood that
the jury took these statements to mean the burden of proof
was on defendant to prove his innocence.

     Second, defendant argues that the prosecutor urged
the jury to convict the defendant based on public policy
grounds. Specifically, defendant highlights the following
statement made by the prosecutor: "Are we going to give
her immunity? You bet we are. We'll do it today and we'll
do it tomorrow. That's the right thing to do. If you don't
get that testimony out, we don't know what happens. If we
don't know what happens, we can't convict the people
[who] are out shooting innocent people on the street."

     Here, the prosecutor was responding to defendant's
allegation that Thomas testified for the People to avoid
her two outstanding warrants and charges for making false
statements to police. He began by explaining that the
district attorney's office did not "take care" of her
warrants, they only explained to her how she could resolve
the matter.

REPORT AND RECOMMENDATION TO DENY
WRIT OF HABEAS CORPUS
- 25 -

1       The argument defendant focuses on was made by the
2    prosecutor in response to defendant's second attack on
     Thomas's credibility regarding the immunity she received
3    to testify. Viewed in context, the prosecutor was
     explaining the benefits of offering immunity to encourage
4    a witness to testify. He posited that granting immunity
     to witnesses allows their testimony to be heard so that
5    evidence can be presented to convict people who commit
     crimes. Although he may have been appealing to the sympathy
6    of the jury by focusing on "innocent people" who get shot,
     we do not find the statement went so far as to suggest that
7    the jury should convict defendant based on public policy.
     The broader implication of the statement was that granting
8    immunity allows the state to prosecute people who commit
     crimes. It is perfectly acceptable argument for the People
9    to justify their decision to grant Thomas immunity for her
     testimony. As such, we find no misconduct in these
     statements. FN5

10

11      FN5. We note the trial court took action to insulate
     the jury from any impropriety which possibly could have
12   been derived from the prosecutor's statements. After
     defendant objected to the [sic] both lines of argument by
13   the prosecutor, the trial court instructed the jury on the
     law regarding each issue -- specifically, that the People
14   had the burden of proof and the jury could not decide the
     case based on public policy. We presume "the jury treated
15   the court's instructions as statements of law, and the
     prosecutor's comments as words spoken by an advocate in
16   an attempt to persuade." (*People v. Sanchez,* 12 Cal.4th 1, 70
     (1995).)

17   (Lodged Document 6 at 19-23.)

18     As the Court of Appeal noted, a prosecutor's conduct

19   violates the Fourteenth Amendment to the federal Constitution when

20   it infects the trial with such unfairness as to make the

21   conviction a denial of due process.   (Lodged Document 6 at 20.)

22   The Court of Appeal is correct that conduct by a prosecutor that

23   does not render a criminal trial fundamentally unfair is

24   prosecutorial misconduct under state law only if it involves the

25   use of deceptive or reprehensible methods to attempt to persuade

26   either the trial court or the jury. (Lodged Document 6 at 20,

27   citing *People v. Morales*, 25 Cal.4th 34, 44 (2001.)) The Court

28

1  further noted that when, as here, the claim is based on a
2  prosecutor's comments to the jury, the question is whether there
3  is a reasonable likelihood that the jury construed or applied any
4  of the complained-of remarks in an objectionable way.  (*Id.*,
5  citing *Morales*, 25 Cal.4th at 44.)

6      The record supports the analysis by the Court of Appeal. The
7  burden shifting comments, in context, did not address defendant's
8  guilt but addressed the claim of collusion by the state's
9  eyewitnesses.  Even if the statements are viewed as objectionable,
10 any error was alleviated by (1) the court's subsequent instruction
11 clarifying that the state bore the burden of proving guilt, and
12 (2) the prosecutor's statement that the defendant had no duty to
13 explain anything or to make any argument.  The undersigned agrees
14 with the Court of Appeal that there is little or no likelihood the
15 jury construed these statements as improperly shifting the state's
16 burden of proof onto the defendant.

17     With respect to the prosecutor's public policy argument, the
18 Court of Appeal notes the context: the prosecutor was responding
19 to the defendant's second attack on witness Thomas's credibility,
20 an attack based on the immunity the People gave  for her
21 testimony.  The Appeal Court found the prosecutor did not go "so
22 far as to suggest that the jury should convict defendant based on
23 public policy;" rather, the Court found the prosecutor's comments
24 amounted to acceptable argument involving no misconduct.  Again
25 the Appeal Court noted that the trial court took action to
26 insulate the jury from any impropriety that could have been
27 derived from the statements by giving a curative instruction

28

REPORT AND RECOMMENDATION TO DENY
WRIT OF HABEAS CORPUS
- 27 -

1  following defendant's objection.

2      There is no allegation nor any evidence that the prosecutor
3  knowingly used false or perjured testimony, the essential elements
4  of prosecutorial misconduct. *Murtishaw v. Woodford*, 255 F. 3d
5  926, 958-959 (9th Cir. 2001).  Mr. Glass does not establish that he
6  was prejudiced by the prosecutor's comments during closing
7  argument, particularly in light of the strong  evidence of guilt.
8  Most importantly for habeas review, the state court's denial of
9  Mr. Glass's claimed prosecutorial misconduct claim was not
10 contrary to or an unreasonable application of clearly established
11 federal law.  The second claim is therefore without merit.

12 **D. Claim 3: Insufficient proof of prior conviction**

13     As noted, the undersigned finds Mr. Glass's third claim is
14 barred by procedural default.  Alternatively, petitioner's third
15 claim fails to raise a colorable federal claim and is
16 unsupported on the merits.

17     Despite Mr. Glass's failure to exhaust this claim in the
18 state's highest court, the district court may exercise its
19 discretion to deny relief when a petitioner does not present a
20 colorable federal claim.  28 U.S.C. § 2254(b)(2) (an application
21 for a writ of habeas corpus may be denied on the merits,
22 notwithstanding the failure of the applicant to exhaust the
23 remedies available in the courts of the State); see also *Gatlin v.*
24 *Madding*, 189 F. 3d 882, 889 (9th Cir. 1999)(district court may
25 exercise discretion to consider merits of unexhausted habeas
26 claim).

27     Under 28 U.S.C. § 2241, a writ of habeas corpus disturbing a

28
REPORT AND RECOMMENDATION TO DENY
WRIT OF HABEAS CORPUS
- 28 -

1 state court judgment may issue only if a prisoner is in custody
2 "in violation of the Constitution or laws and treaties of the
3 United States."  28 U.S.C. § 2241(c)(3).

4     Habeas review does not encompass state court rulings on the
5 admission of evidence unless there is a constitutional violation.
6 *Clemmons v. Sowder*, 34 F.3d 352, 357 (6th Cir. 1994), citing *Fuson*
7 *v. Jago*, 773 F.2d 55, 59 (6th Cir. 1985), *cert. denied*, 478 U.S.
8 1020 (1986).  The court stated:

> Petitioner finally avers that the prosecutor improperly
> testified to, and personally introduced, records of
> petitioner's prior convictions. Petitioner believes the
> prosecutor could only admit such evidence by calling a
> keeper of the records to identify them. Petitioner also
> charges that the prosecutor's testimony is improper
> because he could not be cross examined. The respondent
> counters that it introduced certified copies of petitioner's
> criminal convictions and that, as this assignment of error
> raises no constitutional infirmity, there can be no habeas
> relief. Petitioner, however, contends that the constitutional
> issue is the denial
> of his right to cross examine.
>
> The Kentucky supreme court found the trial court's and
> prosecutor's procedure for the admission of certified
> copies of Clemmons's prior conviction judgments was
> proper. The district court agreed and also found no
> evidence that the procedure violated Clemmons's right
> to due process and a fundamentally fair trial*. See*
> *Estelle v. McGuire*, 502 U.S. 62, 67-68(1991)(Federal
> habeas relief is not appropriate for errors of state
> law). We agree.

21 *Clemmons*, 34 F. 3d at 358 (6th Cir. 1994).

22     In support of his third claim, Mr. Glass argued to the Court
23 of Appeal that the certified copies of the records admitted to
24 support finding a prior conviction did not fall within the record
25 leading to imposition of judgment, and as such were insufficient
26 to support the finding.  His claimed Constitutional violation is
27 that "since the evidence to support the conviction was

28

REPORT AND RECOMMENDATION TO DENY
WRIT OF HABEAS CORPUS

insufficient as a matter of law, further proceedings should be barred by the double jeopardy clause."    (Lodged Document 3 at 43-50.)

The Respondent correctly notes that Mr. Glass attempted to "federalize" the claim by asserting to the California Supreme Court that his right to due process was violated when the State failed to present sufficient evidence of a prior conviction for proof of a prior "strike."  Mr. Glass had not invoked due process protections in the Court of Appeal.  (Ct. Rec. 16 at 21-23.)

Unsurprisingly, the Court of Appeal determined the third claim as a matter of state law.  (Lodged Document 6 at 23-26.) Mr. Glass's third claim is without merit because it fails to raise a colorable federal claim.  See 28 U.S.C. § 2254(b)(2). Alternatively, this court finds no error in the Court of Appeal's analysis that the documentation admitted by the trial court supporting proof of a prior robbery conviction  sufficiently established the conviction.  Accordingly, claim three is without merit.

**V.   CONCLUSION**

For the reasons stated above, **IT IS RECOMMENDED** the Petition for Writ of Habeas Corpus (Ct. Rec. 1) be **DENIED.**

**OBJECTIONS**

Any party may object to the magistrate judge's proposed findings, recommendations or report within ten (10) days following service with a copy thereof.  Such party shall file with the Clerk of the Court all written objections, specifically identifying the portions to which objection is being made, and the basis therefor.

REPORT AND RECOMMENDATION TO DENY
WRIT OF HABEAS CORPUS
- 30 -

Attention is directed to Fed. R. Civ. P. 6(e), which adds another three (3) days from the date of mailing if service is by mail.  A district judge will make a de novo determination of those portions to which objection ids made and may accept, reject, or modify the magistrate judge's determination.  The district judge need not conduct a new hearing or hear arguments and may consider the magistrate judge's record and make an independent determination thereon.  The district judge may also receive further evidence or recommit the matter to the magistrate judge with instructions. See 28 U.S.C. § 636 (b) (1) (C) , Fed. R. Civ. P. 73, and LMR 4, Local Rules for the Eastern District of Washington.  A magistrate judge's recommendation cannot be appealed to a court of appeals; only the district judge's order or judgment can be appealed.

The District Court Executive **SHALL FILE** this report and recommendation and serve copies of it on the referring judge and the parties.

**DATED** this 15th day of January, 2009.


_____s/James P. Hutton___

JAMES P. HUTTON
UNITED STATES MAGISTRATE JUDGE

REPORT AND RECOMMENDATION TO DENY
WRIT OF HABEAS CORPUS
- 31 -